(No. 10545.—Rule discharged.)

THE PEOPLE *ex rel.* The Chicago Bar Association, Relator, *vs.* ALBERT D. WING, Respondent.

*Opinion filed October 21, 1918.*

1. DISBARMENT—*extent to which inquiry in disbarment proceeding is retrospective.* In a disbarment proceeding the inquiry of the court is not retrospective so far as to include facts of a long time past unless they tend to prove the present character and practices of the respondent.

2. SAME—*what is not ground for disbarment.* The facts that an attorney was unreasonably dilatory in paying over to a physician some money that had been left for him with the attorney, and that he accepted a small retainer fee, subsequently returned, to bring a partition suit at a time when he knew he could not attend to it, making it necessary for the client to employ another attorney, are not grounds for disbarment, even though he should have acted promptly or declined the undertakings.

FARMER and COOKE, JJ., dissenting.

INFORMATION to disbar.

JOHN L. FOGLE, (MITCHELL D. FOLLANSBEE, and GEO. A. KELLY, of counsel,) for relator.

JAMES HARTNETT, (FRANK R. GROVER, of counsel,) for respondent.

Mr. JUSTICE CARTWRIGHT delivered the opinion of the court:

At the December term, 1915, of this court an information in the name of the People, on the relation of the Chicago Bar Association, praying that the name of the respondent, Albert D. Wing, be stricken from the roll of attorneys of this court, was filed and he was ruled to answer. He answered at the February term, 1916, and issues having been formed they were referred to a commissioner.

The information contained four charges of alleged misconduct occurring in 1909, 1911, 1914 and 1914, respectively. The commissioner took the evidence and reported that the charges of misconduct in 1909, 1914 and 1914, made in the first, second and third counts, did not, in his opinion, authorize him to recommend the disbarment of the respondent, but as to those offenses suspension from practice for a time might be sufficient, but considering those charges together with the charge based on misconduct in 1911, contained in the fourth count, he concluded the respondent had forfeited his right to practice law and should be disbarred. He therefore recommended an order striking the respondent's name from the roll of attorneys, and exceptions having been taken by the respondent, briefs have been filed by the parties.

The question to be solved is whether the respondent is a fit person to retain the license granted to him by this court and to be entrusted with the business of clients. Events of bygone days may be quite important in determining the existence or non-existence of an alleged fact, provided they are so connected with an alleged existing fact as to form a chain of evidence from which may fairly be deduced such fact. The acts charged against respondent in 1909 and 1911, if proved, were of a time long past, and the inquiry of the court in a case like this is not retrospective so far as to include such facts unless they tend to prove the present character and practices of the one against whom charges are made. With that understanding all the charges and the facts proved will be stated, with the conclusion of the court upon the whole evidence.

The facts as shown by the evidence introduced by the relator and that of respondent, where not contradicted, taken in their chronological order, are substantially as follows:

In 1909 Anna Cwiak applied to the respondent to commence a suit against Juszefa Jendzezek. The two parties owned adjoining lots, and Mrs. Cwiak claimed that Jend-

zezek had encroached upon and damaged her property by building over the line somewhere from three-quarters of an inch to three inches, as shown by different reports of surveyors. The respondent accepted the employment and was paid $50 as fees to prosecute the suit. She also had a claim for the death of her husband, caused by a street car company. Mrs. Cwiak died in 1915, and her son and the respondent both testified that the understanding was that the respondent should take the suit at $50, and he and the firm of Wing & Wing, in which he was interested, should have the other and important case on a percentage of the amount recovered. The respondent commenced suit in the circuit court of Cook county by filing a *præcipe* but filed no declaration, and in March, 1913, an order was entered, on motion of the attorney for the defendant, dismissing the suit. Mrs. Cwiak lived in a Polish settlement on the northwest side, in Chicago, and the respondent received a message from her to come out there. He went, and she showed him alleged damage occasioned from water from the eave-trough on the adjoining building, claiming $1000 additional damage. Afterwards, on receipt of another message, he went out there and she showed him some damage caused by nails driven in a shed out in the back yard. Later another message came to respondent and he went out again, when she claimed that the basement had been flooded on account of rain. She considered her claim as amounting to several thousand dollars while the actual damages were small in amount. The respondent negotiated for and effected a settlement for $200, which she refused to accept. She demanded the surveyors' reports, showing the adjoining building to be over on her lot from three-quarters of an inch to three inches, and demanded a return of the $50. The papers were returned but the money was not, and she made complaint to the grievance committee of the bar association, which was ignored because it related to attorney's fees. Mrs. Cwiak commenced suit in the municipal

court and in May, 1913, recovered a judgment against the respondent for $50 and costs, which has not been paid, and a new complaint was filed for the failure of respondent to satisfy that judgment. She was a Pole and her dealings with the respondent were through an interpreter, and there was a dispute whether respondent took the suit for damages at $50 because the firm in which he was interested was also to have the other suit, which was given to other attorneys.

In 1911 Paul Jasaitis, a Lithuanian, who did not talk English, was defendant on a charge of bastardy in the municipal court and was introduced to the respondent by a saloon-keeper, who interpreted between them. The respondent accepted employment and was paid $30, and upon a trial Jasaitis was convicted. The respondent advised an appeal and told Jasaitis that the expenses would be about $100, and he was paid that amount in two payments of $50 each. Jasaitis furnished an appeal bond, which the respondent filed and had approved, and the respondent paid $25 or $30 for preparing a bill of exceptions, which he presented to the trial judge, but he delayed in perfecting the appeal until it was too late. He took no further steps in the matter of the appeal and it was dismissed on a short record by the Appellate Court. He testified that his reason for advising an appeal and taking the steps he did was that there must be direct evidence in a bastardy case that the woman was unmarried, but finding the court had held that the fact could be proved from inference from other facts and that an appeal was useless, he so advised Jasaitis. He claimed that he was to defend Jasaitis in the municipal court for $100, of which only $30 was paid, and he was entitled to retain the balance in his hands above the cost of the bill of exceptions for his fee. Jasaitis testified that the respondent agreed to try the case in the municipal court for $30 and the $100 was paid solely for an appeal. In his testimony he manifested great discontent and vexation at the outcome of his case and claimed that the respondent neg-

lected it, and accused him of selling out to the other side for $1000 in a case where the liability was only for $550. He also filed a charge with the grievance committee of the bar association, and it was dismissed as simply being a dispute between attorney and client as to the amount of fees due. The charge was renewed in this proceeding, and the saloon-keeper who introduced Jasaitis and interpreted for him was not a witness before the commissioner.

In 1914 Mary Coyne was hurt while working in a hospital and employed an attorney to prosecute a claim before the Industrial Board. She testified that she discharged that attorney and employed another; that the second attorney did crooked work and she discharged him and gave the case to a third attorney; that the third attorney obtained an award and deceived her by telling her he had her money when he had no money, and tried to have her sign papers, which she would not sign because the second attorney had tried the same kind of a game on her, and she said she was going to get another lawyer. The attorney who secured the award went with her to the office of the respondent, and she was paid the amount due her and $100 was given to the respondent to pay Dr. W. J. Mitchell. The charge of the information was that Mary Coyne gave respondent $100 to be paid to W. J. Mitchell, a physician, and $35 to J. P. Zimbrone for taking an X-ray picture, which amounts it had been agreed should be retained and turned over to them. She testified that she did not give respondent any money for Zimbrone and he did not claim any. The respondent was dilatory in paying over the money to Mitchell and gave excuses which in our opinion were not sufficient. He claimed that there were two Mitchells of the same name, but he could doubtless have ascertained which one was entitled to the money. He paid the $100 to Mitchell and claimed that he did not know there was any complaint about it before the grievance committee.

About October 20, 1914, John Collins, husband of Mary Collins, consulted the respondent about bringing a partition suit of a cottage and lot in Chicago, valued at $1700, and was told that the expenses would be in the neighborhood of $200. On October 26, 1914, Mary Collins paid the respondent $15 for costs to bring the suit. The lot was one which Mary Collins, her sister, Mrs. Glenton, and their two brothers, owned as heirs. The suit was not commenced although Collins testified that the respondent told him at different times that the suit had been instituted. The partition suit was commenced by other solicitors in July, 1915, and the property was sold and the sale confirmed the following October. The respondent testified that he prepared the bill and delayed proceedings afterward to amend the bill and make Mrs. Glenton, who lived in Michigan, a party complainant with Mary Collins, and that he also prepared an amended bill but found another amendment was necessary and never got around to make it, and that he understood negotiations were in progress for an amicable settlement. Mary Collins being dissatisfied by reason of the long delay and finding that no suit had been begun, discharged the respondent and demanded the return of the $15. After considerable delay the respondent returned $5 and later returned $10. When the respondent accepted the employment, and during all the time while the matter was pending, he was engaged in important criminal cases. At the time he accepted the employment he was engaged in the defense of one, and for several months his time was entirely occupied with that case and other criminal cases which followed it. He testified that he told Collins he would not be able to attend to the suit for some time and that Collins was satisfied. Collins was a spectator at the trial of the murder case which the respondent was defending, and this was followed by the other important criminal cases, so that, as a matter of fact, the respondent was not able to give any attention to the partition suit. He said that after Collins

learned that the respondent must go into another criminal case Collins thought he had better get another lawyer, which was done.

Taking into consideration all the charges and the evidence tending to sustain them, there is no evidence from which it may be fairly inferred that respondent was guilty of fraud or of using his position as an attorney or his employment for unlawfully obtaining or appropriating to his own use the money of any client without intending and expecting to render efficient services therefor. In 1909 he in good faith accepted employment by Anna Cwiak concerning the encroachment upon her property of from three-quarters of an inch to three inches for a fee of $50, with the understanding that he and the firm in which he was interested should have the other case on a percentage of the amount recovered. She did not talk English and her dealings with the respondent were through an interpreter. If she misunderstood the agreement about the other suit the respondent was not to blame. She was most unreasonable and difficult to get along with, and the respondent did what would hardly be expected of any attorney by making three trips out to her place about petty matters. The judgment of the municipal court fixed his liability to pay the $50, which has not been paid. So far as the charge of 1911 is concerned, the respondent defended the suit and advised an appeal, which he afterward discovered would be useless, and there was a controversy as to fees. It cannot be said that on that question the probabilities are in favor of Jasaitis, and whether Jasaitis lost anything by failure to effect the appeal is at least problematical. It cannot be said that he would have been successful in reversing the judgment, and if the only ground of reversal was the one stated by respondent, Jasaitis was a gainer by not perfecting the appeal. Neither of these transactions, occurring from four to six years before the filing of the information, has any reasonable connection with the question of the personal char-

acter and fitness of the respondent to hold the license of this court and practice law. In 1914 Mary Coyne, who had had trouble with three different attorneys, went with the third one, who had obtained an award for her, to the respondent, and she was paid the part of the award due her and the respondent received $100 for Dr. Mitchell. He was dilatory about paying over the money to Mitchell and gave excuses for the delay which were not very substantial. He accepted employment from Mary Collins for commencing the partition suit at a time when he knew that he could not give it any attention for considerable time. Perhaps prompt action was not very important to her, but an attorney is not voluntarily obliged to accept employment, and if he does so he should act promptly. He was at fault in accepting the employment when he, and, as he claims, the husband of Mrs. Collins, knew he could not attend to the suit for some time. None of the facts proved show such unfitness to practice law as an attorney of this court that the name of the respondent should be stricken from the roll.

The exceptions are sustained and the rule discharged.

*Rule discharged.*

FARMER and COOKE, JJ., dissenting.